UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES | : | |
| | : | |
| v. | : | CRIMINAL NO. |
| | : | 3:02cr53 (SRU) |
| PATRICIA MORRIS | : | |
| | : | |

**RULING**

Patricia Morris pleaded guilty to one count of access device fraud and one count of identity theft. I sentenced her principally to forty-six months' incarceration. She appealed that sentence to the Second Circuit, where it was affirmed. She now seeks relief, *pro se*, under 28 U.S.C. § 2255, primarily on the ground that she was denied effective assistance of counsel. Her motion is denied.

**I.     Background**

On February 26, 2002, Morris waived indictment and entered a plea of guilty to an information charging her with one count of access device fraud in violation of 18 U.S.C. § 1029(a)(2) and one count of identity theft in violation of 18 U.S.C. § 1028(a)(7). As part of her plea agreement, Morris entered into a "Stipulation of Offense Conduct." In that stipulation, she admitted that, while working as a home health care aide, she had taken personal information from three elderly clients and used that information to apply for unauthorized credit cards, which she then used to make purchases and obtain cash advances. In the stipulation, Morris also admitted that she had used the personal information of one of her employers to obtain an unauthorized credit card on which she made purchases and secured cash advances.

Though Morris was initially on pre-trial release, I revoked that release after receiving

evidence that she had someone posing as a court officer – possibly Morris herself[1] – call one of Morris's victims with an offer to pay $9,000 if the victim wrote a favorable letter to the court prior to sentencing. The caller also threatened to initiate an investigation if the victim would not write the requested letter.

Morris was sentenced on October 15, 2002. The Sentencing Guidelines prescribed an offense level of 18,[2] but I upwardly departed by two-points based on a finding of past exploitation of vulnerable victims, an adjustment authorized by application note 4 of section 3A1.1 of the Sentencing Guidelines. Morris had one previous criminal conviction, a plea to two charges of grand theft, which gave her a criminal history of Category I. I increased that to a Category II on the ground that a Category I underrepresented the seriousness of the offense and Morris's risk of recidivism, a departure authorized by section 4A1.3 of the Guidelines.

Morris's attorney asked me to downwardly depart on the ground that Morris's criminal history was overstated and on the basis of Morris's physical and mental health. I found neither departure appropriate.

With an offense level of 20 and a criminal history of Category II, Morris's guideline range was 37 to 46 months' imprisonment. I sentenced her to 46 months' imprisonment.

---

[1] The victim received three calls from a female claiming to be an "Inspector Lorton." The victim was not sure if it was the same person who called each time, but she stated that the person on the third called sounded like Morris. The Department of Social Services conducted an investigation and traced the first two calls to a cell phone used by Morris.

[2] This calculation is based on a base offense level of 6 (section 2F1.1(a)), a 4 point increase because the loss by the victims was between $20,000 and $40,000 (section 2F1.1(b)(1)(E), a 2 point increase because the offense involved more than minimal planning (section 2F1.1(b)(2)), a 2 point increase for abuse of a position of trust (section 3B1.3), a 2 point increase for vulnerable victims (section 3A1.1(b)(1)), and a 2 point increase for obstruction of justice (section 3C1.1). The defendant received no reduction for acceptance of responsibility.

Morris appealed, arguing that (1) her offense level should not have been increased for "abuse of a position of trust," (2) my upward departures were "double counting," (3) my upward departures were independently improper, and (4) she was denied effective assistance of counsel. The Second Circuit affirmed Morris's sentence, but dismissed without prejudice her claim of ineffective assistance of counsel, noting such claims are better pursued under 28 U.S.C. § 2255. *United States v. Morris*, 350 F.3d 32, 39 (2d Cir. 2003).

## II.  Discussion

Read liberally, Morris's claim is primarily one of ineffective assistance of counsel. Specifically, Morris claims that, had her counsel diligently investigated Morris's criminal history, she would have been able to successfully avoid an upward departure, and, perhaps, have secured a downward departure.[3] Morris also makes a host of other claims relating mostly to other aspects of her representation. Even liberally construed, none of these claims has any merit. Finally, Morris makes some statements that, to the extent they are intended to raise claims for relief, are not appropriate for a section 2255 motion.

### A.   Ineffective Assistance of Counsel: Criminal History

Morris's ineffective assistance claim is principally that her attorney failed to adequately investigate Morris' criminal history prior to sentencing and, at sentencing, did not effectively argue against an upward departure.

---

[3] In this proceeding, Morris does not dispute the pre-departure calculation of her guideline range, except to the extent she has asked me to consider whether *Blakely v. Washington*, 124 S. Ct. 2531 (2004), raises any issues in her case. Even assuming that the Supreme Court's application of *Blakely* to the Sentencing Reform Act applies to cases on collateral review, its has no effect in Morris's case; I would have imposed the same sentence whether the guidelines were binding or advisory. *See United States v. Booker*, 543 U.S. __ (January 12, 2005).

My upward departures were based on two incidents in Morris's past. I based my departure under section 3A1.1 on her participation in a robbery in Florida in 1992, where the victims were elderly and disabled. I based my departure under section 4A1.3 on the Florida incident,[4] as well as on a 2001 incident where Morris engaged in credit card theft from a disabled victim.

Because Morris's claim is essentially that her lawyer should have uncovered and presented exculpatory evidence regarding these events, it is appropriate to lay out the circumstances of these events as they were presented by the government at sentencing and as they were presented by Morris at sentencing and in her present motion.

        1.      *Government's Evidence at Sentencing*

            a.      The 1992 Conviction

In 1991 Morris was arrested in Broward County, Florida and charged with two counts of robbery and two counts of abuse of an elderly or disabled person. In 1992, Morris was permitted to plead *nolo contendere* to two reduced charges of grand theft, for which she was sentenced to two years of probation. The charges in question were supported by three officers' sworn affidavits, which gave the following account of Morris's actions.

In September 1991, Morris and another woman entered the home of an elderly mother and her daughter, both of whom were "not fully competent." Morris and her partner found $20,000 in U.S. bonds, and told the mother she would have to accompany them to the bank to

---

[4] My use of the 1992 conviction as a basis for both upward departures was not "double counting," because the departures focus on different aspects of the conduct – the section 3A1.1 departure was based on the victim's vulnerability, the section 4A1.3 departure, on the defendant's likelihood of recidivism. *See Morris*, 350 F.3d at 36-37 (rejecting Morris's double counting argument).

cash the bonds. When the daughter protested, they locked her in a closet. The mother also refused to accompany them to the bank, but relented when they threatened to cut her head off. Morris, her partner, and the mother then drove to the bank where they were able to cash approximately $7,000 of the bonds. The bank employees were suspicious and, after the three left, called the police. The bank then called the victims' residence and informed either Morris or her partner that they could return to the bank to cash the remaining bonds. When Morris, her partner, and the mother arrived, the police questioned them. Morris and her partner gave conflicting stories about why they were there and where the money was. With consent, the police searched Morris and her partner's bags and found the cash as well as check books, social security cards, and other identification belonging to the victims.

            b.       The 2001 Incident

In 2001, Morris was arrested in Connecticut and charged with two counts of credit card theft, five counts of illegal use of a credit card, and criminal impersonation. In the affidavit supporting her arrest, the officer attested to the following facts.

Morris had been employed to help care for a man who had been disabled in an automobile accident. While employed, Morris made charges and received a cash advance on two Discover cards issued in the victim's name. Some of the charges were made after Morris was no longer employed by the victim. The victim and his mother stated that to his knowledge he only had one Discover card, and Morris was not authorized to make charges on that card. When questioned, Morris claimed she was authorized to use the Discover cards. When asked about the whereabouts of the second card, Morris did not know, but said she might have thrown it in the garbage.

In return for her payment of restitution for the unauthorized charges and payment of a $500 fine, the charges against Morris were dismissed.

2. *Morris's Version of Her History*

Both at her sentencing and in her numerous filings in support of her section 2255 motion, Morris has pressed her own version of both prior incidents.

a. Statements at Sentencing

With respect to the 1992 conviction, at sentencing Morris denied any wrongdoing.

> I've denied the situation in Florida. I had nothing to do with that. I just happened to be in the wrong place at the wrong time. Nobody touched anybody. Nobody took anything. My daughters and I were on vacation in Florida and we just happened to go with a girlfriend helping her with her patients, and I don't know what happened but I had nothing to do with it, and the money I had was from an envelope from a bank up in Wolcott and I proved it.

(Tr. at 49)

She claimed that she had exculpatory evidence that would back up this claim, and that she and her attorney had attempted to get that information.

> And I did my best and my attorney has tried to locate the attorney in Florida and get this information from him, but I don't know if he's moved or passed away or what has happened. I don't know but we really, really tried to get this information for you. Both of us did. I even wrote family, like I said . . . .

(Tr. at 51) She also described some of the supposed exculpatory evidence.

> And I did get a letter from the judge that did say that this was all a big mistake, and I used to carry it with me everywhere I went and I tried to get my lawyer to see if we could get another copy but we would have to pay for it and to have the transcripts for the court proceedings to be done.

(Tr. at 56) Morris also stated that "the judge and the state's attorney both said that was a mistake." (Tr. at 60)

-6-

Additionally, at sentencing, I permitted Morris's daughter to make a statement. She stated she recalled the 1992 incident and that her mother was out in the car at the bank, until asked to come in to break up a fight.

> And Gail had come out, the young lady that brought the women into the bank, saying that these two women were hysterical, they were fighting and arguing and so forth, and asked my mom for help. So my mother went into the bank and there, next think you know, just a bunch of cops were coming and so forth and they were bringing everybody out in handcuffs.

(Tr. at 52-53)

Morris also stated that the police acted inappropriately in Florida.

> They took the money that supposedly was stolen from me and they spent it on athletic equipment for the police department and they never returned it to the so-called "alleged victims" so that kind of just proves something right there.

(Tr. at 55)

With respect to the 2001 incident, Morris stated at sentencing that the victim had given her the Discover card to use to pay for gas to drive her boyfriend, who was dying of "chronic lympho lukemia," to the hospital. (Tr. at 38)

        b.        Statements in Morris's Current Filings

Morris's lengthy filings with the court in support of her present motion essentially reiterate the story she told at sentencing, with some modifications. She now asserts that there was no letter sent to her by the judge, but rather: "The information that I'm referring to is the actual transcript of the sentencing, where the Judge and the prosecutor state that this was all a mistake." She claims, however, that the transcript has since been destroyed.

Additionally, she includes many more details about the events surrounding the attempt to cash the $20,000 in bonds, including numerous statements about the background of the

-7-

victims and their alleged mental and familial problems. She also now states that all three of them went into the bank together when they returned a second time and that the victim was in fact accusing the bank manager, not Morris and her partner, of theft.

Morris also claims that in Florida she had gone to court not to plead guilty but to get "the truth out in the open." And she "was so disappointed when I got to Court and my lawyers said you have to plead guilty." According to Morris, the rationale for that instruction was that, "the Court will not allow you to expose the police for making such a big mistake like this." In light of this, Morris says, she "stood before the Judge, he and the Prosecutor, on record, stated that this was all a mistake, and I replied yes it was and pled guilty against my will."

With respect to the 2001 events, she also repeats a similar story to the one she told in court, stating that "[the victim] and his father knew I had used the card for gas."

### 3. *Morris's Counsel's Conduct*

Morris appears to be making two arguments. First, that her counsel was ineffective for failing to present Morris's version of her criminal history. Second, that her counsel was ineffective for failing to investigate Morris's story in order to present corroborative evidence at sentencing.

In order to demonstrate ineffective assistance of counsel, Morris must show (1) that her counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Judicial review of counsel's actions is "highly deferential." *Bell v. Cone*, 535 U.S. 685, 598 (2002).

To the extent Morris is arguing that her counsel was ineffective in not presenting Morris's

version of her past history, there is no prejudice.  At sentencing Morris was allowed to fully present her version of the events surrounding her 1992 and 2001 activities, which she did.  In her section 2255 filings, Morris has not added any material information to her stories, except to the extent she has created more inconsistency and added more incredible details.  Accordingly, regardless of whether Morris's attorney had a duty to present Morris's version of events, there is no prejudice because Morris herself made me fully aware of her position about what really happened.

To the extent Morris is arguing that her counsel was ineffective for failing to investigate Morris's version of events, I conclude that there was no defect in counsel's representation.  A lawyer "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*. 466 U.S. at 690-91.  Even if I assume that Morris told her lawyer every detail that she has conveyed to the court both at sentencing and in her submissions in support of her present motion, and even if I further assume that her lawyer took no steps to investigate those assertions, that does not make counsel's representation ineffective.[5]  A lawyer has no duty to undertake a wild-goose chase to uncover evidence that might support a palpably incredible defense proposed by her client.  It is even conceivable that undertaking such an investigation might harm a client, by wasting time and resources that could better be devoted to the pursuit of more reasonable claims.

Morris claims she told her lawyer that (a) her plea to a crime, which all the available evidence indicated she committed, was the result of a conspiracy to coerce her by her former

---

[5] Because I am accepting Morris's version of her interactions with her lawyer, there is no need to ask the lawyer for an explanation of these events, something I would typically do when faced with an ineffective assistance claim.

lawyer, the judge, and the prosecutor, for which the latter two apologized to her on the record; and (b) she was innocent of committing a crime for which she agreed to make restitution and pay a fine, a crime virtually identical to the crimes to which she pled guilty in federal court, and a crime that all the available evidence indicated she committed. It was reasonable for her lawyer not to waste time investigating these assertions, but instead to focus – as she did – on presenting mitigating evidence concerning her client's health and character.[6]

Moreover, even if Morris's counsel were required, and failed, to investigate those claims, Morris has not demonstrated any prejudice in her counsel's failure to conduct such an investigation. With respect to the 1992 conviction, Morris states that there is no longer a copy of the transcript of the proceedings. To the extent she indicates there are any people who could have testified on her behalf, those people are primarily the victims of her crime,[7] i.e., the very people whose statements led to her arrest in the first place. With respect to her 2001 actions, Morris does not explicitly indicate what evidence she believes her lawyer could have uncovered, but, again, it appears that her story would have to be corroborated by her victims, namely, those people whose statements formed the basis for her initial arrest. In short, Morris would have to

---

[6] This decision was even more reasonable in light of Morris's apparent tendency to fabricate the existence of favorable testimony. For example, at her bond revocation hearing, Morris claimed that the victim who had been threatened had in fact willingly volunteered to help Morris and was willing to come in and testify to that effect. She made this claim despite the fact that in several conversations with investigators and Assistant United States Attorneys the victim never changed her story and never expressed any desire to testify to a different version of events. In her current submissions, Morris claims she had a notarized letter from the victim supporting Morris's version, but her attorney lost it.

[7] Morris also appears to claim that some of the two victims' other family members might support her story. It is not clear how they could, given that none of the other family members Morris identifies were present when the events in question occurred.

show that, but for her lawyer's failure to investigate, the people whose statements originally incriminated her would have come to sentencing and testified to the exact opposite of what they previously said.

Morris has nothing but her own assertion to support her claim that those witnesses would, if called at sentencing, have reversed their previous statements. The Second Circuit requires some objective evidence other than a defendant's assertions to establish prejudice. *See Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003). Courts are particularly skeptical when reviewing a petitioner's bare assertion that a witness would have testified in a particular way. *See Croney v. Scully*, 1998 WL 69766, *2 (E.D.N.Y. June 13, 1988), *aff'd*, 880 F.2d 1218 (2d Cir. 1989); *Stewart v. Nix*, 31 F.3d 741, 744 (8th Cir. 1994) (holding that to prove prejudice petitioner must show that witness would have testified). Accordingly, I do not think there is a "reasonable probability" that Morris's attorney could have found and presented testimony that would have changed the outcome of the sentencing proceeding.

Because I conclude that, under the circumstances of this case, it was reasonable for Morris's lawyer not to undertake an investigation into Morris's assertions about her past history and because there was no prejudice from any lack of investigation or any failure to present Morris's version of events, Morris has no claim for ineffective assistance with regard to her criminal history.

B.    <u>Ineffective Assistance of Counsel: Other Issues</u>

Morris argues that, in various other ways, her counsel's representation was defective. None of these arguments has any merit.

Morris argues that her lawyer was ineffective in failing to present more mitigating

evidence concerning Morris's physical and mental health. There is no prejudice in such a failure. Morris's counsel did argue for mitigation based on Morris's health. To the extent Morris is arguing that her counsel should have presented *all* of Morris's medical records – which Morris has now submitted – that claim fails. A review of all the medical records that Morris has submitted with her motion discloses nothing in them that would have caused me to sentence her differently.

Morris argues that her lawyer should have had Morris psychologically evaluated. The United States Probation Office did speak with a doctor who had evaluated Morris's psychological condition and reported those results to me prior to sentencing. There is no indication of any flaw in that report. Consequently, there is no prejudice from her lawyer's failure to procure a second evaluation.

Morris argues that her lawyer should have offered mitigating evidence regarding Morris's history of childhood abuse. The probation office report fully explained this aspect of Morris's history to me prior to sentencing. Accordingly, there is no prejudice from her lawyer's failure to present that evidence.

Morris argues that her lawyer should have argued for a departure based on Morris's family's dependence on her. Even accepting as true all Morris's current allegations in support of such a departure, I would not have downwardly departed or refrained from my upward departure. Accordingly there is no prejudice.

Morris argues that her lawyer did not understand the sentencing guidelines. Even if true, there is no prejudice, because her sentence was appropriate under the guidelines.

    C.    <u>Other Claims</u>

Morris makes a number of other claims in cursory fashion throughout her filings, relating, among other things, to the terms of her supervised release and her competence to plead guilty. These claims were not raised on direct appeal and there does not appear to be any reason they could not have been. Accordingly, they are procedurally defaulted. *Campino v. United States*, 968 F.2d 187 (2d Cir. 1992) ("It is generally accepted that a procedural default of even a constitutional issue will bar review under § 2255, unless the defendant can meet the 'cause and prejudice' test.").

In her various submissions, Morris discusses problems she has with the conditions at her place of incarceration. Assuming that Morris wishes to assert a claim for relief on those grounds, a motion under 28 U.S.C. § 2255 is inappropriate, not merely because it is formally the wrong statute – an error the court could perhaps correct – but because it fails to name the appropriate respondent, namely, Morris's custodian. *See United States v. Huss*, 520 F.2d 598, 603-04 (2d Cir. 1975) (conditions of confinement not properly raised in section 2255 motion). Accordingly, if Morris wishes to make such a claim, she should file a petition under 28 U.S.C. § 2241, naming the appropriate respondent. The denial of Morris's petition under section 2255 is without prejudice to the refiling of a conditions of confinement claim.

Morris's motion for relief pursuant to 28 U.S.C. § 2255 (doc. # 29) is DENIED.

It is so ordered.

Dated at Bridgeport, Connecticut, this 12th day of January 2005.

        /s/ Stefan R. Underhill
        Stefan R. Underhill
        United States District Judge